John R. BURTON, suing on behalf of himself and all other similarly situated holders of $7 Cumulative Second Preferred Stock of European Gas & Electric Company, Plaintiff,

v.

EXXON CORPORATION, European Gas & Electric Company, R. F. Dilworth, D. G. Gill and W. W. Stewart, Defendants.

No. 81 Civ. 5040 (GLG).

United States District Court,
S. D. New York.

April 8, 1982.

As Amended April 19, 1982.

---

Dickstein, Shapiro & Morin, New York City and Chestnut & Brooks, P.A., Minneapolis, Minn., for plaintiff and plaintiff class; Leonard Garment, Peter W. Morgan, New York City, and Thomas H. Graham, Minneapolis, Minn., of counsel.

Sullivan & Cromwell, New York City, for defendant Exxon Corp.; Roy H. Steyer, Robert M. Osgood, Nadine Strossen, Albert P. Lindemann, Jr., Kenneth M. Bialo, New York City, of counsel.

Walsh & Frisch, New York City, for European Gas & Elec. Co.; Jerome K. Walsh, Richard M. Auerbach, New York City, of counsel.

Satterlee & Stephens, New York City, for defendants Dilworth, Gill and Stewart; Robert M. Callagy, Ronald R. Papa, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

This is a diversity action brought by the plaintiff John Burton, a holder of "$7 Cumulative Second Preferred Stock" (Second Preferred) in the European Gas & Electric Company (Eurogasco),[1] against Eurogasco, the Exxon Corporation, R. F. Dilworth, D. G. Gill, and W. W. Stewart. He alleges that they breached their fiduciary duties to all Second Preferred shareholders, and he seeks various forms of equitable relief. Before this Court is Exxon's motion, in which all defendants join, to dismiss the complaint.[2]

Eurogasco is a Delaware corporation whose affairs are directed by Exxon. Since 1937, Exxon has controlled Eurogasco's Board of Directors, and since 1975, all directors have been employees of Exxon or its affiliates. (The individual defendants in this action are the current directors of Eurogasco.) Exxon also owns 91% of Eurogasco's outstanding shares—100% of the "$7 Cumulative First Preferred Stock" (First Preferred), 26.5% of the Second Preferred, and 90.9% of the Common Stock.[3] Besides the obvious advantages of owning such a large percentage of a corporation's stock, Exxon, as holder of the entire class of First Preferred, enjoys dividend and dissolution rights far superior to those of the other shareholders. For example, although the holders of the First Preferred and the Second Preferred are each entitled to an annual dividend of seven dollars per share and, upon dissolution, to $105 per share plus accrued but unpaid dividends, Eurogasco's Certificate of Incorporation and Certificate of Designation provide that payments to the holders of the First Preferred take precedence over payments to the holders of the other classes of stock. Thus, before dividends can be paid to the holders of the Second Preferred, the annual dividends and any arrearages must be paid to the holders of the First Preferred. Likewise, the holders of the Second Preferred cannot receive any dissolution payments until the rights of the First Preferred shareholders have been completely satisfied.

Eurogasco's business activities have been dormant for over thirty years. Organized in 1931, it engaged in the business of exploring for, producing, transporting, and selling oil and natural gas in Hungary, Austria, and Czechoslovakia during the 1930's. It lost substantially all its assets, however, as a result of World War II and the nationalization of industry by the Hungarian Communist regime in 1948. (These assets were held by wholly owned Austrian and Hungarian subsidiaries.) According to Exxon, the pursuit of compensation claims arising from the loss of these assets has been the sole reason for Eurogasco's existence since 1948.

Eurogasco has achieved some success in its pursuit of compensation. Most recently, it received a series of payments totalling approximately nine million dollars from the Hungarian government pursuant to the 1973 United States-Hungarian Claims Agreement.[4] The last payment under this agreement in September 1980, however, marked the last payment that Eurogasco could hope to receive for its losses in the 1940's.

1. The plaintiff is suing on behalf of himself and all other similarly situated Second Preferred shareholders. Whether this lawsuit can proceed as a class action, however, has not been determined. By agreement of the parties, the plaintiff's motion to maintain a class action and for certification of the class will be heard within 30 days of a resolution of the motion presently before this Court.

2. Throughout this opinion, it will be referred to simply as Exxon's motion.

3. Eurogasco has issued and outstanding 22,100 shares of First Preferred, 7,336 shares of Second Preferred, and 2,098,100 shares of Common Stock.

4. In 1956, Eurogasco filed a claim with the Foreign Claims Settlement Commission and was awarded $28,002,035. Until the Claims Agreement, however, Eurogasco received only $987,201 because the source of the funds was a limited amount of Hungarian assets in the United States. It should also be noted that, in the early 1960's, Eurogasco received $979,702 from the Austrian government in connection with its former Austrian assets.

Early in 1981, therefore, Eurogasco's Board of Directors concluded that no useful purpose would be served by the continued existence of the corporation and decided to seek dissolution. As two-thirds of each preferred class of stock had to approve the dissolution, the Board adopted a resolution calling for a shareholder vote at the annual meeting in May 1981. In preparation for the vote, a proxy statement was sent to all shareholders. The statement apprised the Second Preferred shareholders that, due to the financial condition of Eurogasco, they would receive no dissolution payments. It also informed all shareholders that, if the resolution was not approved, Exxon might seek a court ordered dissolution. Not surprisingly, the resolution was defeated at the annual meeting; although 100% of the First Preferred shareholders—that is, Exxon—approved, only 38.3% of the Second Preferred shareholders voted for dissolution.

The plaintiff filed this lawsuit in August 1981. At issue is the use of the money received from Hungary pursuant to the Claims Agreement. Among other things, this money was placed on deposit with Exxon and used to pay $4.1 million in dividends on the First Preferred stock.[5] The plaintiff asserts that these actions, as well as certain tax decisions, amounted to a breach of the defendants' fiduciary duties to the Second Preferred shareholders. He now seeks an order requiring the defendants to account for all profits received as a result of the breach, to convey these profits to Eurogasco's corporate treasury, to invest these profits in accordance with their fiduciary obligations to the Second Preferred shareholders, and to refrain from any attempts to dissolve Eurogasco.

In October 1981, Exxon petitioned the Delaware Court of Chancery for dissolution of Eurogasco. (This petition was filed on the same day that Exxon filed this motion.) That court, however, has stayed the action pending resolution of Exxon's motion in this Court.

It is against this backdrop that we now view Exxon's motion to dismiss. The motion is based on the following grounds. Initially, Exxon argues that the Court does not have subject matter jurisdiction over this action. Alternatively, it argues that, even if the Court does have jurisdiction, it should decline to exercise it because there is now a related action pending in the Delaware Chancery Court or because the action involves the internal affairs of a Delaware corporation. For the reasons stated below, this motion is denied.

## I. Jurisdiction

The first issue raised by this motion is whether this Court has jurisdiction to adjudicate the plaintiff's claims. According to Exxon, jurisdiction is lacking because the amount in controversy does not exceed $10,-000. *See* 28 U.S.C. § 1332(a) (1976). We disagree.

Unlike an action for damages, determination of the amount in controversy— "the value of the object of the litigation," *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 347, 97 S.Ct. 2434, 2443, 53 L.Ed.2d 383 (1977)—can present difficulties in a suit for equitable relief. *McCarty v. Amoco Pipeline Co.*, 595 F.2d 389, 391–92 (7th Cir. 1979). In particular, the court is faced with the problems of determining what rights are implicated by the lawsuit and attaching a monetary value to those rights. *Id.* at 392. These problems, however, are tempered somewhat by the fact that absolute precision in valuing the object of the litigation is not required. *Moore v. Betit*, 511 F.2d 1004, 1006 (2d Cir. 1975). Only if it is "legally certain" that the jurisdictional amount requirement cannot be met should a court dismiss for lack of jurisdiction. *Hunt v. Washington State Apple Advertising Commission, supra*, 432 U.S. at 346, 97 S.Ct. at 2443; *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938); *Moore v. Betit, supra*, 511 F.2d

---

5. Even after these dividends were paid, the arrearages on the First Preferred still amounted to $2,861,950 as of December 31, 1980. The arrearages on the Second Preferred amounted to $2,499,665.

at 1006. *See generally Novosel v. Northway Motor Car Corp.*, 460 F.Supp. 541, 544 (N.D.N.Y.1978) (legal certainty test makes it difficult to dismiss a complaint for failure to meet the jurisdictional amount requirement).

Exxon's argument is that the jurisdictional amount requirement is not satisfied because, taken from the viewpoint of the plaintiff and the class he seeks to represent, *see Kheel v. Port of New York Authority*, 457 F.2d 46, 49 (2d Cir.), *cert. denied*, 409 U.S. 983, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972), the rights being protected in this lawsuit are inherently speculative and unmeasurable. *See Kheel v. Port of New York Authority, supra*, 457 F.2d at 49; *Rosado v. Wyman*, 414 F.2d 170, 176–77 (2d Cir. 1969), *rev'd. on other grounds*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). In support of this proposition, Exxon places primary reliance on *Kheel v. Port of New York Authority, supra*. *Kheel* involved a challenge to the constitutionality of a New York statute that limited Port Authority investment in "non-self-supporting" railroad facilities. Reasoning that the possible benefits of a successful lawsuit were indirect and incapable of valuation, the Second Circuit held that the jurisdictional amount requirement was not satisfied. *Id.* at 49; *see also Texas Acorn v. Texas Area 5 Health Systems Agency, Inc.*, 559 F.2d 1019, 1023 (5th Cir. 1977) (benefit that plaintiffs would receive as a result of adequate representation on the board of directors of a public health agency); *Podrazik v. Blum*, 479 F.Supp. 182, 188 (N.D.N.Y.1979) (right to own unencumbered property), *aff'd. mem.*, 622 F.2d 575 (2d Cir.), *cert. denied*, 446 U.S. 922, 100 S.Ct. 1860, 64 L.Ed.2d 277 (1980); *State v. Holy Spirit Ass'n. for World Unification*, 464 F.Supp. 196, 198 (S.D.N.Y.1979) (parent's right to custody of a child); *Post v. Payton*, 323 F.Supp. 799, 803, 804 (E.D.N.Y.1971) (right to receive information and ideas); *Ackerman v. Columbia Broadcasting System, Inc.*, 301 F.Supp. 628, 633–34 & n.17 (S.D.N.Y.1969) (same); *Boyd v. Clark*, 287 F.Supp. 561, 562, 564 (S.D.N.Y.1968) (three-judge court) (increased likelihood of induction into the armed forces), *aff'd.*, 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969).

*Kheel* and the other cases cited by Exxon, however, do not mandate dismissal of this action. The rights being protected in this lawsuit are not intangible and speculative in the same sense as the rights asserted in the cases cited above. As the Second Circuit itself noted in *Moore v. Betit*, "the proposition that indirect damages and damages [that] are too speculative do not support jurisdiction ... has traditionally been applied to damages [that] are intangible or to damages incapable of reduction to monetary terms such as free speech, child custody and loss of personal liberty." *Moore v. Betit, supra*, 511 F.2d at 1006 (footnotes omitted). In this instance, a successful lawsuit can result in benefits to the plaintiff and the putative class that "flow[ ] directly and with a fair degree of probability from the litigation." *Kheel v. Port of New York Authority, supra*, 457 F.2d at 49.

The plaintiff seeks to protect the rights of the Second Preferred shareholders to receive at least part of the $2.5 million in dividend arrearages owed to them. If all the relief requested is obtained, Exxon will have to account for several million dollars and reinvest that money in accordance with its fiduciary duties to the Second Preferred shareholders. (The plaintiff claims that the fund available for investment would be approximately seven million dollars.) It appears reasonably probable that, over time, the returns on this investment would enable Eurogasco to pay at least $10,000 in dividends to the Second Preferred shareholders, in addition to paying dividends and arrearages to the holders of the First Preferred. At a minimum, we cannot say "to a legal certainty" that this will not occur. *See Hunt v. Washington State Apple Advertising Commission, supra*, 432 U.S. at 347–48, 97 S.Ct. at 2443–2444 (in determining whether the losses incurred due to the continued enforcement of a statute satisfied the jurisdictional minimum, the Court concluded that "the continuing nature of the statute's interference ... preclude[s] our saying 'to a legal certainty,' ... that such

losses and expenses will not, over time, if they have not done so already, amount to the requisite $10,000").

Two final points deserve mention. As Exxon has not disputed the point, the amount in controversy has been measured by the benefit of the litigation to the putative class as a whole. Accordingly, this Court has not determined if it would have jurisdiction if the class is not certified or if the claims of the individual class members are separate and distinct, a conclusion that would preclude aggregation. *See Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973); *Snyder v. Harris*, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). These issues, however, can be considered after the plaintiff's motion for class certification has been decided.

Additionally, if some jurisdictional problems do arise, this Court will be obliged to consider whether the amount in controversy can be measured from Exxon's viewpoint, a theory that, curiously, has not been mentioned by either party.[6]

## II. *Abstention*

Exxon's second ground for dismissal is based on the pending dissolution petition in the Delaware Chancery Court. According to Exxon, only the Delaware court is capable of granting complete relief, for only the Delaware Chancery Court can dissolve Eurogasco and distribute its assets to shareholders. Thus, it argues that principles of comity and efficiency require this Court to decline jurisdiction in deference to the

---

**6.** For the purposes of this motion, this Court has calculated the amount in controversy by looking to the value of the lawsuit to the plaintiff. Known as the plaintiff's viewpoint rule, this method of determining whether the jurisdictional amount requirement is satisfied has found wide acceptance in the courts. *See* 1 Moore's Federal Practice ¶ 0.91[1], at 841–42 & n.6 (2d ed. 1981) (collecting cases); 14 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3703, at 403–05 & n.6 (1976) (same). The theoretical justification for this rule is that, because the plaintiff has the burden of showing that jurisdiction exists, the value of the lawsuit from his viewpoint should control. *Kheel v. Port of New York Auth.*, *supra*, 457 F.2d at 48–49; 14 C. Wright, A. Miller & E. Cooper, *supra*, § 3703, at 405. Additionally, use of this standard has been thought "to produce greater certainty of result and promote simplicity in terms of deciding the jurisdictional amount question." *Id.*

In the eyes of some courts and commentators, however, the plaintiff's viewpoint rule is far too restrictive. Professor Moore, for example, writes that the certainty and simplicity of the plaintiff's viewpoint rule

"should not be allowed to blind federal courts to the realities of the magnitude of the controversy.... Since the jurisdictional amount prerequisite was enacted primarily to measure substantiality of the suit, the question of whether the controversy is substantial should not be answered unqualifiedly by looking only to the value of that which the plaintiff stands to gain or lose."

1 Moore's Federal Practice, *supra*, ¶ 0.91[1], at 846, *quoted in McCarty v. Amoco Pipeline Co.*, *supra*, 595 F.2d at 394.

The alternative approach in actions seeking equitable relief is to determine the amount in controversy by looking to "the pecuniary result to either party which the judgment would directly produce," the either viewpoint rule. *Ronzio v. Denver & R.G.W.R. Co.*, 116 F.2d 604, 606 (10th Cir. 1940) (footnote omitted); *accord, Oklahoma Retail Grocers Assoc. v. Wal-Mart Stores, Inc.*, 605 F.2d 1155, 1160 (10th Cir. 1979); *McCarty v. Amoco Pipeline Co.*, *supra*, 595 F.2d at 391–95; *Smith v. Washington*, 593 F.2d 1097, 1099 (D.C.Cir.1978); *Committee for GI Rights v. Callaway*, 518 F.2d 466, 473 (D.C.Cir.1975); *Donohue v. Board of Elections*, 435 F.Supp. 957, 964 n.11 (E.D.N.Y. 1976); *see Commonwealth v. United States Veterans Administration*, 541 F.2d 119, 122 n.3 (1st Cir. 1976); *Williams v. Kleppe*, 539 F.2d 803, 804 n.1 (1st Cir. 1976). *See generally* 1 Moore's Federal Practice, *supra*, ¶ 0.91[1], at 846; 14 C. Wright, A. Miller & E. Cooper, *supra*, § 3703, at 408–09. Use of this rule promotes the policy underlying the jurisdictional amount requirement while ensuring that cases involving a substantial controversy are not excluded from the federal courts by an artificial rule of convenience. (The most powerful argument against utilizing this rule is that the Supreme Court has implicitly precluded such a course in its decisions forbidding aggregation of separate and distinct claims to reach the jurisdictional minimum, *Zahn v. International Paper Co.*, *supra*, and *Snyder v. Harris*, *supra*. *Snow v. Ford Motor Co.*, 561 F.2d 787 (9th Cir. 1977). The soundness of this argument, however, appears to be an open question.) If the either viewpoint rule were applied to the case at bar, the jurisdictional amount requirement would clearly be satisfied because Exxon would be compelled to return several million dollars to Eurogasco's corporate treasury if the relief sought is granted.

pending state action. This argument is without merit.

■ There is little question that a federal court can, in its discretion, defer to a similar action pending in state court and abstain from exercising its jurisdiction. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817–19, 96 S.Ct. 1236, 1246–1247, 47 L.Ed.2d 483 (1976); *Levy v. Lewis*, 635 F.2d 960, 965 (2d Cir. 1980); *Clarkson Co. v. Shaheen*, 544 F.2d 624, 629 (2d Cir. 1976); *see Leber-Krebs, Inc. v. Clinton*, 517 F.Supp. 593 (S.D. N.Y.1981); *Daugherty v. Popick*, 89 F.R.D. 642 (S.D.N.Y.1981). *See generally* 17 C. Wright, A. Miller & E. Cooper, *supra*, § 4247 (1978). Considerations of economy and sound judicial administration sometimes make this the prudent course of action. On the other hand, it is equally clear that, in most cases, a federal court should not decline to exercise its jurisdiction. Abstention "is the exception, not the rule." *Colorado River Water Conservation District v. United States, supra*, 424 U.S. at 813, 96 S.Ct. at 1244; *accord, Levy v. Lewis, supra*, 635 F.2d at 967; *see Colorado River Water Conservation District v. United States, supra*, 424 U.S. at 817–19, 96 S.Ct. at 1246–1247.

In evaluating the propriety of dismissing or staying a diversity action in deference to a similar state action, a host of factors can properly be considered by the court. The order in which the suits were commenced is a good example. *Colorado River Water Conservation District v. United States, supra*, 424 U.S. at 818, 96 S.Ct. at 1246; *Mahkimetas v. Dascola*, 336 F.Supp. 689, 690–91 (E.D.Wis.1971); *Jones Knitting Corp. v. A. M. Pullen & Co.*, 50 F.R.D. 311, 316 (S.D.N.Y.1970). If the state suit were commenced before the federal one, considerations of comity might support a decision to abstain. Comity would not require abstention, however, if the federal suit was commenced first. *See* Note, *Stays of Federal Proceedings in Deference to Concurrently Pending State Court Suits*, 60 Colum.L.Rev. 684, 702 (1960) [hereinafter cited as *Stays of Federal Proceedings*]. Indeed, a federal court

should be cautious in such a situation lest it encourage parties to commence state actions simply to avoid litigating in the federal forum. *See Jones Knitting Corp. v. A. M. Pullen & Co., supra*, 50 F.R.D. at 316; *Stays of Federal Proceedings, supra*, 60 Colum.L.Rev. at 702. Other considerations include

> [the] promotion of judicial efficiency; [the] adequacy and extent of relief available in the alternative forum; [the] identity of parties and issues in both actions; [the] likelihood of prompt disposition in the alternative forum; [the] convenience of parties, counsel and witnesses; and [the] possibility of prejudice to a party as a result of the stay.

*Universal Gypsum of Georgia, Inc. v. American Cyanamid Co.*, 390 F.Supp. 824, 827 (S.D.N.Y.1975) (quoting *Nigro v. Blumberg*, 373 F.Supp. 1206, 1213 (E.D.Pa.1974)). As the Supreme Court has noted, however, "[n]o one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required." *Colorado River Water Conservation District v. United States, supra*, 424 U.S. at 818–19, 96 S.Ct. at 1246–1247.

■ After considering all the circumstances, this Court finds it unwise to abstain from exercising jurisdiction in this instance. Several factors are particularly relevant. First, the dissolution action in the Delaware Chancery Court was commenced after the filing of this suit. *See Mahkimetas v. Dascola, supra*, 336 F.Supp. at 690–91 (that federal action was commenced prior to state action was a factor in the decision not to grant a stay); *Jones Knitting Corp. v. A. M. Pullen & Co., supra*, 50 F.R.D. at 316 (same). Second, the parties and the issues in the two actions are not identical. The issue in the Delaware action is whether the Chancery Court should dissolve Eurogasco. The main issue in this suit is whether the defendants breached their fiduciary duties to the Second Preferred shareholders. Questions concerning dissolution arise only insofar as the plaintiff seeks to remedy the alleged breaches by enjoining the defendants from

seeking to dissolve the corporation. Admittedly, Exxon has represented to this Court that it would not object to allowing the plaintiff to raise his claims in the context of the dissolution proceeding. There is, however, no assurance that these claims will be litigated. The Delaware court has not made a decision on this matter, and Exxon has not apprised this Court of any Delaware law that clearly shows that the Chancellor must hear the plaintiff's claims.[7] *See Abdin v. Goodbody & Co.*, 339 F.Supp. 1311, 1313 (E.D.Wis.1972) (when it was unclear that state action would dispose of all issues and that some defendants could be joined in the state action, abstention was not warranted); *First American Corp. v. Foster*, 51 F.R.D. 248, 251 (N.D.Ga.1970) (same). *See generally Northern Oil Co. v. Socony Mobil Oil Co.*, 368 F.2d 384, 388 (2d Cir. 1966). Finally, on January 14, 1982, the Delaware proceedings were stayed pending a decision on this motion. The Chancellor proposed to " 'set a procedure as to the future course of this action in light of the decision.' " Letter to the Court from Robert Osgood (Jan. 18, 1982) (quoting Chancellor Marvel of the Delaware Chancery Court). Thus, it is not entirely clear that there will be a prompt disposition of the Delaware action.[8]

## III. *Internal Affairs*

Exxon's final argument for dismissal essentially raises an issue of *forum non conveniens*. Specifically, we are faced with the question whether jurisdiction should be declined because resolution of the issues in

this lawsuit would require the Court to interfere with the internal affairs of a foreign corporation—in this case, one incorporated pursuant to the laws of the State of Delaware.[9] Naturally, Exxon argues that dismissal is particularly appropriate in this case. Once again, however, we must disagree.

That an action touches upon the internal affairs of a foreign corporation does not automatically require a district court to dismiss the case and relegate the parties to a forum in the corporation's state of domicile. *Koster v. Lumbermens Mutual Casualty Co.*, 330 U.S. 518, 527, 67 S.Ct. 828, 833, 91 L.Ed. 1067 (1947); *Hoffman v. Goberman*, 420 F.2d 423, 427 (3d Cir. 1970). It is but one factor, albeit an important and sometimes controlling one, *Williams v. Green Bay & Western Railroad*, 326 U.S. 549, 554, 66 S.Ct. 284, 286, 90 L.Ed. 31 (1946); *see Panama Processes, S.A. v. Cities Service Co.*, 650 F.2d 408, 413 (2d Cir. 1981), to be considered by the court in determining whether the suit is more appropriately tried in another forum. *Koster v. Lumbermens Mutual Casualty Co., supra*, 330 U.S. at 527, 67 S.Ct. at 833; *Hoffman v. Goberman, supra*, 420 F.2d at 427; *see Panama Processes, S.A. v. Cities Service Co., supra*, 650 F.2d at 411–14. *See generally Piper Aircraft Co. v. Reyno*, —— U.S. ——, ——, 102 S.Ct. 252, 261, 70 L.Ed.2d 419 (1981) ("If central emphasis were placed on any one factor, the *forum non conveniens* doctrine would lose much of the very flexibility that makes it so valuable."). As in all *forum*

---

**7.** In support of its position, Exxon has cited two cases, *Leber-Krebs, Inc. v. Clinton, supra*, and *Daugherty v. Popick, supra*, in which this Court stayed federal actions pending completion of similar state actions. Both cases, however, are factually distinguishable from the case at bar. For example, both state actions were commenced before the federal ones, and there was an identity of issues not present here.

**8.** It should be noted that future events could tip the equities toward abstention. For example, if it is clear that Burton's claims will be fully adjudicated in the Delaware proceeding and if it is likely that they can be disposed of significantly sooner than they can in this forum, the Court might be inclined to reconsider its position.

**9.** On the proposition that this raises an issue of *forum non conveniens*, see *Koster v. Lumbermens Mutual Casualty Co.*, 330 U.S. 518, 526, 67 S.Ct. 828, 832, 91 L.Ed. 1067 (1947); *Williams v. Green Bay & Western Railroad*, 326 U.S. 549, 554, 66 S.Ct. 284, 286, 90 L.Ed. 31 (1946); *Rogers v. Guaranty Trust Co.*, 288 U.S. 123, 151, 53 S.Ct. 295, 305, 77 L.Ed. 652 (1933) (Cardozo, J., dissenting); 15 C. Wright, A. Miller & E. Cooper, *supra*, § 3828, at 181–82 (1976). *See also Panama Processes, S.A. v. Cities Service Co.*, 650 F.2d 408, 411–13 (2d Cir. 1981) (case involving the internal affairs of a foreign corporation was evaluated on a *forum non conveniens* basis).

*non conveniens* cases, the court should also consider public interest factors, such as "the problems of court congestion, jury duty, local interest in the controversy and the advantages of having a court familiar with the law [that] is being applied," *Manu International, S.A. v. Avon Products, Inc.*, 641 F.2d 62, 64–65 (2d Cir. 1981) (summarizing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)), as well as those factors of private interest that relate to the "practical problems [of making] trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp. v.*

*Gilbert, supra*, 330 U.S. at 508, 67 S.Ct. at 843.[10] In the final analysis, the decision to dismiss on the grounds of *forum non conveniens* rests with the court's notions of how the convenience of the parties and the ends of justice can best be served.[11] *Koster v. Lumbermens Mutual Casualty Co., supra*, 330 U.S. at 527, 67 S.Ct. at 833; *accord, Rogers v. Guaranty Trust Co.*, 288 U.S. 123, 131, 53 S.Ct. 295, 298, 77 L.Ed. 652 (1933) ("jurisdiction will be declined whenever considerations of convenience, efficiency and justice point to the courts of the State of the domicile as appropriate tribunals for

**10.** The factors to be considered by a court when determining whether to dismiss on the grounds of *forum non conveniens* were delineated in *Gulf Oil Corp. v. Gilbert, supra*. The Supreme Court noted that

"[a]n interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforc[ea]bility of a judgment if one is obtained. The court will weigh relative advantages and obstacles to [a] fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, 'vex,' 'harass,' or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

"Factors of public interest also have [a] place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself."

*Id.* at 508–09, 67 S.Ct. at 843 (footnote omitted).

**11.** At this point, it is appropriate to note that Exxon argues that this Court must follow New York law in deciding whether to dismiss this action. Although the soundness of this argument is open to debate, *compare Weiss v. Routh*, 149 F.2d 193, 195 (2d Cir. 1945) (New York decisions concerning the "internal affairs doctrine" were followed) *and Prescott v. Plant Industries, Inc.*, 88 F.R.D. 257, 261 (S.D.N.Y. 1980) (same) *with Panama Processes, S.A. v. Cities Service Co., supra*, (in an action involving the internal affairs of a corporation, court applied the public and private interest factors delineated in *Gulf Oil Corp. v. Gilbert* ), we do not think it necessary to resolve that question, for we believe that New York courts are also required to view the "internal affairs doctrine" as an aspect of *forum non conveniens*. As then Chief Judge Cardozo noted,

"[t]o trace in advance the precise line of demarcation between the controversies affecting a foreign corporation in which jurisdiction will be assumed and those in which jurisdiction will be declined, would be a difficult and hazardous venture. A litigant is not, however, to be excluded because he is a stockholder, unless considerations of convenience or of efficiency or of justice point to the courts of the domicile of the corporation as the appropriate tribunals."

*Travis v. Knox Terpezone Co.*, 215 N.Y. 259, 264, 109 N.E. 250, 251 (1915); *see Koster v. Lumbermens Mutual Casualty Co., supra*, 330 U.S. at 529–30, 67 S.Ct. at 834 (although lower court opinions in New York often do not mention factors other than that the internal affairs of a corporation are involved, "they say nothing to detract from the general rule of New York as stated in [*Travis* ]"). *See generally Piper Aircraft Co. v. Reyno, supra*, —— U.S. at —— n.13, 102 S.Ct. at 262 n.13 (whether the state law of *forum non conveniens* must be applied in a diversity case is an open question).

the determination of the particular case"); see *Piper Aircraft Co. v. Reyno, supra,* —— U.S. at ——, 102 S.Ct. at 265 (trial court has much discretion in dismissing an action on the grounds of *forum non conveniens*); *Panama Processes, S.A. v. Cities Service Co., supra,* 650 F.2d at 414 (same). There is no magical combination of factors that will warrant dismissal. *Panama Processes, S.A. v. Cities Service Co., supra,* 650 F.2d at 414. One firm and inflexible rule can, however, be stated: " 'unless the balance [of factors] is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.' " *Manu International, S.A. v. Avon Products, Inc., supra,* 641 F.2d at 65 (quoting *Gulf Oil Corp. v. Gilbert, supra,* 330 U.S. at 508, 67 S.Ct. at 843); *accord, Calavo Growers of California v. Belgium,* 632 F.2d 963, 969 (2d Cir. 1980) (Newman, J., concurring), *cert. denied,* 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1981).

When a motion to dismiss on the grounds of *forum non conveniens* is based primarily on the fact that the action touches upon the internal affairs of a foreign corporation, it seems appropriate to begin the analysis by evaluating the strength of this "internal affairs factor." In the first instance, the degree of interference that will be required by the action should be examined. For example, a much stronger argument for dismissal is made in an action that would require continuous supervision and direction of corporate management than in an action that involves the internal affairs of the corporation only incidentally. *See Hoffman v. Goberman, supra,* 420 F.2d at 427; *Panama Processes, S.A. v. Cities Service Co.,* 500 F.Supp. 787, 793–95 (S.D.N.Y.1980), *aff'd,* 650 F.2d 408 (2d Cir. 1981). Additionally, the underlying reasons for the hesitancy to retain jurisdiction over actions touching upon a foreign corporation's internal affairs and the extent to which they are implicated in a particular case should be considered. These include the possible inability of the court to enforce all necessary decrees, *see Williams v. Green Bay & Western Railroad,*

*supra,* 326 U.S. at 555–56, 66 S.Ct. at 287; *Panama Processes, S.A. v. Cities Service Co., supra,* 650 F.2d at 413; 17 Fletcher Cyclopedia of the Law of Private Corporations § 8426, at 376 (rev. vol. 1977), the possibility of inconsistent legal rules affecting corporate operations if various states took jurisdiction over like actions, *see Prescott v. Plant Industries, Inc.,* 88 F.R.D. 257, 261 (S.D.N.Y.1980) (quoting *Adolph Meyer, Inc. v. Florists' Telegraph Delivery Association,* 36 Misc.2d 566, 567, 232 N.Y.S.2d 913, 915 (Sup.Ct.1962) ("This declination is not based on a lack of power but on the equitable notion 'that the corporation may have members [or stockholders] extending throughout a number of [S]tates and while an action may affect the plaintiff alone, if various [S]tates assume jurisdiction in like actions, different rules of law would prevail affecting the internal affairs of the corporation.' "), and the possibility that the management policies or organic structure of the corporation may "be changed in such a way as to work substantial detriment to any stranger to the suit." *Rogers v. Guaranty Trust Co., supra,* 288 U.S. at 150–51, 53 S.Ct. at 304–305 (Cardozo, J., dissenting). It appears reasonable to conclude that the less these considerations are implicated, the less reason there is to disturb the plaintiff's choice of forum.

■ Turning to the facts of this case, we note that the plaintiff asks this Court to order the defendants, *inter alia,* to invest the money returned to Eurogasco in accordance with their fiduciary duties to the Second Preferred shareholders and to refrain from any attempts to dissolve Eurogasco. Certainly, this would appear to require the Court to exercise direct control over Eurogasco's internal affairs.[12] Nevertheless, we do not believe that the "internal affairs factor" is exceptionally strong in this instance because the reasons for not taking jurisdiction over a case involving a foreign corporation's internal affairs are not implicated to as great a degree as one might expect at first blush. Exxon is the

---

12. The allegations that the defendants breached their fiduciary duties and the demand that they return all profits realized as a result of the breach to the corporate treasury would require

the court to become involved in Eurogasco's affairs only incidentally. *See Rogers v. Guaranty Trust Co., supra,* 288 U.S. at 150–51, 53 S.Ct. at 304–305 (Cardozo, J., dissenting).

only party that can be adversely affected by a victory for the plaintiff; no strangers to the suit will be harmed by the decision of the Court. Indeed, all others with an interest in Eurogasco—the Second Preferred shareholders and the holders of the common stock—would benefit insofar as a successful suit would keep alive their right to receive dividend payments. Moreover, there appears to be no possibility that corporate management could be burdened with inconsistent rules of law governing the conduct of its internal affairs, for it appears highly unlikely that another action will be brought by another Second Preferred shareholder in another forum. Finally, we perceive no problem of enforceability. Exxon is, in essence, Eurogasco. If a decree enjoining dissolution is required, however unlikely that may be, it can be entered *in personam* against Exxon, which has its principal place of business in New York and which is within the jurisdiction of this Court.

Whatever the strength of the "internal affairs factor," however, it cannot tip the balance in favor of dismissal when the other public and private interest factors are considered. As to the public interest factors, it should first be noted that New York has at least as much connection to this lawsuit as does Delaware. New York is the place in which both Eurogasco and Exxon have their principal places of business. It is also the place in which the corporate decisions and activities in question occurred. Delaware's only connection with this lawsuit seems to be its status as Eurogasco's state of incorporation. Moreover, that Delaware law may provide the rule of decision in this case presents no particular problems. A federal court in a diversity case must frequently apply the law of a state other than the one in which it is sitting. As to the private interest factors, there is nothing to indicate that a trial in Delaware would be more "easy, expeditious and inexpensive" than one in New York. Indeed, it is probably easier to try this case in New York, as all Eurogasco's corporate books and records are located here and counsel for both parties maintain offices here.

This Court has some reservations about the merits of this case and, in particular,

about the propriety of the relief requested by the plaintiff. "The doctrine of *forum non conveniens* is intended to avoid trial in inappropriate forums, [however,] not to avoid meritless suits." *Manu International, S.A. v. Avon Products, Inc., supra,* 641 F.2d at 68. In this case, the balance of factors does not strongly favor dismissal. Thus, we feel constrained not to disturb the plaintiff's choice of forum.

CONCLUSION

In sum, dismissal on the grounds proffered by Exxon is unwarranted. Denial of the motion, however, should not be taken as an indication by the Court that the Delaware action should not proceed. Indeed, many of the same reasons that lead this Court to forego abstention—for example, lack of an identity of issues and parties—appear to make it quite proper for the Delaware Chancery Court to rule on Exxon's petition. Whatever future effects that a resolution of the Delaware action may have on this lawsuit will simply have to be dealt with when they occur.

SO ORDERED.